# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 9, 2016

## STATE OF TENNESSEE v. JOSE REYES

**Appeal from the Criminal Court for DeKalb County**
**No. 2013-CR-99     David A. Patterson, Judge**

---

**No. M2015-00504-CCA-R3-CD – Filed May 24, 2016**

---

The defendant, Jose Reyes, was convicted of one count of rape of a child and sentenced to thirty-two years at 100%. On appeal, he argues that the evidence is insufficient to sustain the verdict and that the trial court erred in several of its rulings. Specifically, he asserts that the trial court erred in: denying his motion in limine to prevent the Child Advocacy Center facility dog from being present with the victim as he was testifying; denying his motion to suppress his written statement and his motion in limine that the statement be excluded at trial; denying his motion to dismiss the superseding indictment; denying his motion for a continuance to locate a witness; denying his motion in limine to exclude testimony regarding his having sexual relations or watching pornography in the presence of the victim; denying his motion for judgment of acquittal; imposing an excessive sentence; and considering the victim impact statement, which included references to HIV, herpes, and gonorrhea. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Craig P. Fickling, District Public Defender; and Allison R. West, Assistant Public Defender, for the appellant, Jose Reyes.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Greg Strong, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

The defendant was convicted of raping the victim, who was 10 years old at the time of the trial and had been spending the night with the defendant when the offense occurred.

The victim's grandmother testified as the first witness, saying that she had a close relationship with him and would "spoil him every chance [she] got." In November 2012, he was living alternately with her and with his mother, as well as with "friends." Once or twice a month, as well as on weekends, he would stay with a "long-time family friend," from whom the defendant rented a room. In March 2013, the defendant moved from the friend's residence, apparently to live with some of his friends in a trailer and, later, to a house next to it.

She said that the victim and defendant were "good friends," and the victim continued to spend several nights per week, as well as weekends, at the defendant's new residence. Following a conversation she had with the victim, she became "very upset" and "confronted" the defendant. She said that she does not speak Spanish and, thus, questioned him in English regarding what the victim had told her. He "denied it and he cried and he begged and said he would never hurt him. And I told him but you did." The following day, the victim's mother took him to the sheriff's department and met with Detective Mike Billings, who began investigating the matter.

On cross-examination, the victim's grandmother said that the victim had been staying with the defendant, in this fashion, for several months and seemed to be happy.

The victim testified that presently he was 10 years old. From November 2012 through March 2013, he was staying, alternately, at his grandmother's house and at that of his aunt, where the defendant also lived. He said that he spoke "[a] little" Spanish, conversed with the defendant in English, and was understood by the defendant. He said that when he was with the defendant in the defendant's bedroom, the defendant "[s]tuck his privates in my butt." The victim said that the defendant touched him "skin to skin" and did not touch him anywhere else. This happened around the first of 2013, and he told his grandmother, although not right after it had happened. The victim explained that he was referring to the defendant's penis when he talked about his "privates."

On cross-examination, the victim said that, although he had not bled after the incident, he had a "really bad pain." He said he did not return to stay with the defendant after this happened and had not seen him since then.

2

Sheriff Patrick Ray, of the DeKalb County Sheriff's Office, testified that the defendant was being housed in the county jail. When he spoke with the defendant, he did so in English; Sheriff Ray said he could not speak Spanish.

Detective Mike Billings said he had worked in law enforcement for approximately 20 years and had formerly worked for Sheriff Ray. He said that the victim and his mother had come to the Sheriff's office on March 6, 2013, where he met with them. He called the Department of Children's Services, and, along with one of its representatives, met with the victim and his mother. Later that day, he went to the defendant's residence, where the defendant answered the door, saying to him, "I know why you're here, you're here because of [the victim]." The defendant told Detective Billings that he knew there were "some allegations made against him that he had raped [the victim]." The defendant gave permission for his residence to be searched and, afterwards, Detective Billings took him to the sheriff's office for an interview. He spoke English to the defendant, who responded in English. He said that the sheriff's department could summon interpreters to talk with non-English speakers, but he did not need one in speaking with the defendant because each understood the other. He advised the defendant of his <u>Miranda</u> rights, and the defendant waived them in writing. Detective Billings asked if the defendant wanted to write out his statement, and he responded that he would rather have Detective Billings do so. Detective Billings then proceeded to write exactly what the defendant told him, and, after finishing, read the statement to the defendant and asked if there were any additions or deletions to be made. The defendant responded that there were not and signed the statement. As read aloud by Detective Billings, the defendant had told him:

> I have lived in DeKalb County for about seven years and about four months ago I met [the victim]. And he would want to come to my house and stay all night with me on the weekends [the victim] had stayed at my house about twenty times and sometimes he would sleep with me and most of the time we both slept in our boxers. There was two times he would try to get in the bed naked and I told that is not right and sometimes he would put them on and sometimes he would just jump under the covers naked.

> Sometimes I could smell him and I would make him take a shower and I would stand by the door and he would try and spray water on me at my face, but it wouldn't make me mad.

> It has been a month since I had sex and it was with a girl from the bar I met. I do know Tina Young was over there at my house one night or two and we had sex. I don't remember if [the victim] saw us or not. Sometimes when we was driving down the road, [the victim] would say

3

stuff like my penis is hard and I would tell him to shut up and sometimes he would ask if I would take him to the strip club, but I told him he could not go.

One time I was in the living room watching TV and (sic) came out of my room and he said come look and he had a hard on. And I said what, what the hell are you doing and he said he played Grand Theft Auto game and it was giving him a hard on.

I never raped [the victim], but one time I was high that day and he wanted me to do it. I told him a thousand times not to, but he kept on asking and saying please get frisky. I told him it's not right. He promised if I did this he wouldn't let anyone else try it. We was lying down and I put a condom on, but I didn't stick it all the way in, just rubbed it on him twice. I wish I didn't do it, I was just fucked up in the head and I would never do anything to hurt [the victim]. Signed by [the defendant].

Detective Billings further testified that he had collected from the defendant's residence "condoms, unopened condoms, condoms under the bed, porno movies."

Following the testimony of Detective Billings, the State rested its case-in-chief, and the defendant then did likewise, without presenting proof.

## ANALYSIS

We will consider the issues raised on appeal by the defendant.

### I. Presence of Dog in the Courtroom

The defendant filed two motions in limine regarding the presence in the courtroom of a "facility" dog. The first motion asserted that the presence of the dog, "Murch," which was provided by the Child Advocacy Center, for the victim during his testimony, would be "overly prejudicial to the defendant." The second motion asked that, if the trial court did allow the facility dog to be present in the courtroom during testimony, "the dog . . . be available to assist all witnesses in the trial, if desired by the witness, including the Defendant, should the Defendant exercise his right to testify in his own defense." Subsequently, the trial court conducted an evidentiary hearing on these motions.

At the hearing, Jennifer Wilkerson, the Executive Director of the Upper Cumberland Child Advocacy Center testified that she was Murch's handler. She said that he was a "facility dog" and could be utilized in a number of ways, including when there

4

was trauma to a victim or witness to a crime. Ms. Wilkerson said that Murch had been trained from birth until he was nearly two years old for obedience, as a service animal, and had gone through public access tests. She, herself, had gone through a two-week training program, which training she maintained each year, to be his handler. In a courtroom, he was to lie "very quiet and calm," be "invisible," and provide "comfort."

Ms. Wilkerson said that she was trained as a forensic interviewer, which she described as a "neutral non-biased party who interviews a child." She described the changed behavior of the victim when he was with Murch:

> [The victim] was very apprehensive and appeared very anxious, scared and frightened about the process. After bringing Murch in and allowing [the victim] to spend a little time with him, he seemed to immediately calm down. He was drawn to the animal, pet [sic] the dog, and appeared to be a little bit more relaxed and able to focus and talk.

She continued that the victim seemed "much more relaxed and comfortable in the court environment with the animal present." She said that, if Murch was to be beside the victim during his testimony, she would ask that the victim first be seated and she then would walk Murch to him and place the dog in a "down command position."

The State explained that, at the trial and before the jury returned to the courtroom, the victim would be seated on the witness stand, with Murch in a down position at his feet, where he would remain during direct and cross-examination. After the victim concluded his testimony, the jury then would be excused from the courtroom before the victim and Murch left the witness stand. The court noted that, by this procedure, the jury "could not see him much from what I can see, if he's going to be at the side of this jury box. I can't see him from where I am, the dog, that is." At the conclusion of the hearing, the court denied the first motion in limine and permitted Murch to be with the victim as he was testifying. The court granted the defendant's second motion in limine, thus making the dog available to any witnesses who testified, using the same procedure as intended with the victim. However, it does not appear from the record that Murch was present in the courtroom other than during the testimony of the victim.

At the conclusion of the trial, the court gave a special jury instruction as to Murch:

> During this trial, a witness was accompanied by [a] courthouse facility dog. The dog is trained, it is not a pet and it does not belong to the witness. The dog is equally available to both the prosecution and the defense. You must not draw any inference regarding the dog's presence.

5

Each witness'[s] testimony should be evaluated upon the instructions that I give you.

While the cases involving the use of a facility dog during a trial are not plentiful, it is clear that the evolving law permits their use.

In State v. Dye, 309 P.3d 1192 (Wash. 2013), the fifty-six-year-old victim of a residential burglary had a mental age estimated at between six and twelve years of age, and an IQ of 65. A number of items were stolen from his apartment by his former live-in girlfriend and another boyfriend of hers. After the thefts, the victim became very fearful, sleeping with mace, a frying pan, and two knives. During his interview by defense counsel, the victim was accompanied by Ellie, a golden retriever that lived with and was trained by the prosecutor assigned to the victim's trial. The State asked that Ellie be allowed to accompany the victim at the trial, arguing that the victim had significant anxiety regarding it, the fact that he functioned at the level of a child, and that he was fearful of the defendant. Finding that the victim was developmentally disabled, had suffered significant emotional trauma, and that Ellie would be lying at his feet during testimony, the trial court allowed the victim's testimony to proceed as requested by the State.

On appeal, the Washington Supreme Court approved the presence of the facility dog during the trial. The court noted that the cases in this regard were "in largely universal agreement that abuse of discretion is the correct standard" of review. Further, the court observed that:

> Both the general trend of courts to allow special procedural accommodations for child witnesses and the deference built into the abuse of discretion standard require us to respect the trial court's decision in how to structure its own proceedings. While the possibility that a facility dog may incur undue sympathy calls for caution and a conscientious balancing of the benefits and the prejudice involved, the trial court balanced the competing factors appropriately.

Dye, 309 P.3d at 1200-01.

Likewise, in People v. Chenault, 227 Cal. App. 4th 1503 (Cal. Ct. App. 2014) the defendant was tried for committing lewd acts on two juveniles, one of whom was eleven years old at the time of trial, and the other thirteen. The prosecution asked that the court allow the use of a service dog, which had provided support for victims and witnesses for several years, with the dog sitting under the witness stand as the two victims testified. On appeal, the court concluded that, in determining whether a service dog could be used in

6

this fashion, the trial court should consider the facts of the case, circumstances of the witnesses, and whether the presence of the dog would assist the witness "to testify without undue harassment or embarrassment and provide complete and truthful testimony." Id. at 1517. In allowing the presence of the service dog, the court explained on appeal, the trial court should "attempt to make the presence of the support dog as unobtrusive and as least disruptive as reasonably possible" and shall give an "appropriate admonishment to the jury to avoid, or at least minimize, any potential prejudice to the defendant." Id.

In People v. Tohom, 109 A.D.3d 253 (N.Y. App. Div. 2013), the court discounted any prejudice to the defendant from the presence of "Rose," a Therapy Assistance Golden Retriever, to accompany the minor victim to the witness stand to testify regarding her being sexually assaulted by her father, resulting in her twice becoming pregnant and having abortions:

> We are not unmindful that Rose may have engendered some sympathy for [the victim] in the minds of the jurors. However, there is no proof that such sympathy was significantly greater than the normal human response to a child's testimony about his or her sexual abuse at the hands of an adult.

Id. at 268.

The court further noted that the trial court gave "specific instructions that it must not permit sympathy to enter into its considerations," an instruction which the jury was presumed to follow. Id.

In the present appeal, the trial court also determined that the presence of Murch during the young victim's testimony would ease his being able to testify and that Murch would be handled in such a way as to make his presence as unobtrusive as possible and, further, the trial court instructed the jury that no inferences should be made, nor sympathy result from the presence of the facility dog. Accordingly, we cannot conclude that the trial court abused its discretion in permitting the use of the facility dog, Murch, during the trial. See Casey Holder, Comment, All Dogs Go to Court: The Impact of Court Facility Dogs as Comfort for Child Witnesses on a Defendant's Right to a Fair Trial, 50 Hous. L. Rev. 1155, 1157 (2013).

This assignment is without merit.

## II. Sufficiency of the Evidence

The defendant argues that the state failed to present sufficient proof that he penetrated the victim.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn.Crim.App.1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, or any part of a person's body or of any object into

8

the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

As we will explain, we conclude that the State sufficiently proved that the defendant penetrated the victim.

Our supreme court explained in State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001), that "[t]he occurrence of penetration, even though penetration is statutorily defined, is a question of fact. Thus, if the evidence is such that any rational trier of fact could have found penetration beyond a reasonable doubt, the evidence must be deemed sufficient." Applying this rule, the court in State v. Maxwell Monroe Hodge, No. E2014-01059-CCA-R3-CD, 2015 WL 1417285, at *4 (Tenn. Crim. App. Mar. 26, 2015), perm. app. denied (Tenn. June 12, 2015), explained that the proof of penetration was sufficient:

> [T]he victim testified that she was awakened by feeling the defendant's hand on her vagina and that "it felt like he was trying to pry [her] open." When asked on direct examination whether she felt the defendant's fingers "manipulating or touching [her] vaginal area" the victim replied, "I felt the pressure. That's what woke me up." On cross-examination, the victim testified, "Pressure, penetration in my mind is the same thing." When asked if she knew whether he had "actually penetrated [her] vagina," the victim replied, "I felt violated and penetrated, yes, sir."

In State v. Albert L. Schlief, No. E2008-02147-CCA-R3-CD, slip op. at 15-16 (Tenn. Crim. App. Mar. 15, 2010), this court concluded that proof of penetration was sufficient based upon the victim's testimony that that the defendant "'tried to put his wiener in [her] butt,'" that his penis did not "enter [her] body," that she could tell that the accused was trying to penetrate her anus with his penis "'[b]ecause [she] felt him . . . [o]n [her] butt,'" and that the action was "'[u]ncomfortable.'"

In the present appeal, the victim testified on direct examination that the defendant, "stuck his privates in my butt" and, on cross-examination, that the defendant made him feel "really bad pain." Defense counsel correctly points out that, during cross-examination, the victim agreed when counsel asked if the defendant had "put his private on your private." However, the jury was entitled to resolve any conflicts in the victim's testimony, and we conclude that a reasonable jury could have determined that the defendant penetrated the victim's anus. Accordingly, this issue is without merit.

### III. Motion to Suppress Defendant's Statement

The defendant argues that the court erred in allowing Detective Mike Billings, of the DeKalb County Sheriff's Department, to recite to the jury the statement made to him by the defendant regarding the complaint of the victim because the defendant's statement was not made "voluntarily, knowingly, or intelligently."

At the hearing on the motion to suppress, Detective Billings testified that he had investigated the rape complaint against the defendant. He said he had spoken with him both at the defendant's residence, which he searched, as well as at the jail. He said that, at the jail, he advised the defendant of his <u>Miranda</u> rights and interviewed him on the day of his arrest from 11:15 p.m. until 2:00 a.m. Detective Billings did not feel, during the interview, that the defendant could not understand English; and the defendant did not say that he did not. Additionally, the defendant did not ask for an interpreter and Detective Billings had "no problem whatsoever" understanding him. To further show the defendant's ability to understand English, during the hearing Detective Billings read aloud a letter, written in English, which had been taken from the defendant at the jail and had been intended for "one of the victim's fathers":

> I'm so sorry for what's going on, all this. I don't know if you believe me or not. I'm not sure you don't. The detective set me up on lies. He got all the evidence from mom, make (sic) me say anything I don't want. He knew how much I care [for the victim] and know it (sic). I would do anything for [the victim]. He, he forced me to say what I say (sic) was in love, for I feel for you all. He told me it, if it, I don't say it, who he want, he was going to put [the victim] in foster home and get his mother arrested. Nanna won't have her grandchildren. I feel like piece of trash who give up and say what he wants to. I did it cause I didn't want this to happen. I know you don't believe me and none will.
>
> I did never hurt, I didn't never hurt your son, I swear. Just think about it. I am HIV positive, give me the test and you'll find out the truth. I live for the truth because I promised to him I would do anything.

Detective Billings said on cross-examination that there "was no point that I felt he needed any assistance. [The defendant] was talking to me in English just like we're talking." He added that the defendant "never said a Spanish word at all during the interview and I would not know, because he spoke English the whole time we talked. He never spoke Spanish." He said that at the beginning of the interview and reading the <u>Miranda</u> rights to the defendant, he asked, "Did he understand," and the defendant responded that "he understood English and understood what I was talking about."

10

Detective Billings said that, after he had written out the defendant's statement, he "read it to him and held it in front of him and we went over it together and said (sic) is this correct, is this your statement to me and he said yes."

The defendant testified at the hearing that he twice asked Detective Billings for a lawyer and was told he would get a lawyer when he went to court. He said that Detective Billings "asked [him] some questions, but he was pretty much like making me, like forcing me to agree. And he was using my feelings, feelings that I have for that child." The defendant continued that he was afraid that Detective Billings would arrest the victim's mother and "put the child away somewhere." The defendant said he felt he "was forced to say everything [he] was supposed to say." He said that Detective Billings spoke only English to him, but he could not understand all that was said.

Following the testimony at the hearing, the trial court explained why the defendant's statement was admissible at trial:

> [T]here isn't a question in the court's mind that the defendant understands English. He has a real difficulty here today. . . . [I]n order to show that he did not voluntarily waive his rights, there has been testimony to show that he knew exactly what it was that was being asked of him. . . . I understand and I believe that the defendant understands when he's told that he doesn't have to speak and he can have an attorney and that's what has been testified to here today. You don't have to speak, you may have an attorney, pretty simple. A matter of do you understand <u>Miranda</u> and its ramifications, I think may give him a little difficulty but there's no question that the [S]tate has shown today that the constitutional rights of the defendant have not been violated, that the statement is freely and voluntarily given and it's given with an understanding to questions that are being asked, the importance of the answers that are being given. And so the written statement, for these purposes and for the purposes of this motion, [is] admissible.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See <u>Miranda v. Arizona</u>, 384 U.S.

436, 444 (1966). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

Following the testimony of witnesses at the hearing on the motion to suppress, as we have set out, the court found that the defendant understood English and had voluntarily and knowingly waived his rights before giving his statement. As trier of fact, the court accredited the testimony of the State's witnesses and discounted that of the defendant. Because the evidence does not preponderate against these findings, we conclude that this assignment is without merit.

## IV. Motion to Dismiss Superseding Indictment

The defendant argues that the superseding indictment should have been dismissed because it changed the dates of the offense, denying him of notice of "which date(s) he should be prepared to defend against." The State responds that, other than assert the changed dates impaired his ability to defend himself, the defendant presented no evidence to prove this claim that he was prejudiced because of the superseding indictment.

The original indictment alleged the defendant had committed the offense on "the 22nd day of February, 2013." The superseding indictment, presented to the grand jury on April 17, 2014, alleged that the offense occurred "between the 1st day of November, 2012 and the 7th day of March, 2013." The trial in this matter began approximately two months later, on June 30, 2014.

An indictment is not required to state the exact date an offense is alleged to have occurred unless the date of the offense is a material ingredient to the offense. See Tenn. Code. Ann. § 40-13-207; State v. Byrd, 820 S.W.2d 739, 740 (Tenn. 1991). "[T]he State need allege only that the offense was committed prior to the finding of the indictment or presentment." Byrd, 820 S.W.2d at 740.

In this matter, the defendant has not shown that his trial preparation was hampered by the changed dates. We note he filed a bill of particulars after the return of the superseding indictment, to which the State responded with the time of day and location of the act, identified a witness and described what had occurred.

Because the defendant has not shown that his ability to defend himself was affected by the superceding indictment, we conclude that this issue is without merit.

## V. Motion for Continuance

On the day of trial, the defendant filed a motion for continuance, stating that defense counsel had "recently discovered new contact information for a potential defense witness," that counsel believed the "potential witness [would] be extremely helpful to [the] defense," and counsel had "made multiple attempts to contact the potential witness and left multiple voice messages at the new phone number." The defendant argues that the trial court erred in denying this motion.

The granting of a continuance lies within the sound discretion of the trial court, and we will not reverse that decision absent a showing of an abuse of discretion. State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (citing State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004)). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." Id. (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)).

Because we have only the defendant's version of what the testimony of these two witnesses would have been, we cannot assess the extent to which they might have benefitted him, especially given the strong proof in this matter. Further, it is apparent from the record that defense counsel already had expended considerable effort in attempting to secure these witnesses for the trial, and there is no basis for our concluding that a resetting of the trial would have been of benefit in this quest. We cannot conclude that the trial court abused its discretion in denying the continuance.

## VI. Motion in Limine

As we have set out, prior to the trial, the defendant filed a motion in limine, asking that the court prohibit the state from presenting any evidence regarding his "watching porography with or without the alleged victim present," or "having sexual intercourse in the presence of the alleged victim," such evidence being irrelevant to the issues.

13

We review the trial court's decision to admit or exclude this evidence under an abuse of discretion standard. See State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996). Tennessee Rule of Evidence 401, which governs the initial issue of relevancy, requires the trial court to first determine whether the proffered evidence is relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 403 provides that, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

At the hearing on this motion in limine, the defendant argued that the jury should not hear that portion of his statement as to the defendant's watching pornography with or without the victim present or having intercourse in the presence of the victim. We note that the defendant's statement to Detective Billings refers to the defendant's having sexual relations with a woman, but he did not remember whether the victim had seen them or not. At the conclusion of the hearing, the trial court noted that the defendant's statement previously had been found to be admissible, and the court concluded that the probative value of the references to the defendant's watching pornography or having sexual relations with a woman was not outweighed by any prejudicial effect. Later, when Detective Billings testified before the jury, he read the defendant's statement as he had recorded it, including the two references to which the defendant had objected. The victim was not asked about either of these matters on either direct or cross-examination. During the arguments on this motion at the hearing on the motion for new trial, the court amplified its ruling at trial, explaining that "[t]he cases such as these obviously involve grooming of the victim by the defendant and that testimony lent itself to show that." This portion of the defendant's statement was not mentioned by the State during its closing arguments.

We cannot conclude that the trial court erred in ruling that the probative value of the statements outweighed any prejudicial effect. Additionally, given the fact that this case was defended upon the claim that penetration had not occurred, only touching, any error by the trial court with this evidentiary ruling would have been harmless.

## VII. Motion for Judgment of Acquittal

As to this issue, the defendant makes the same claim that he did regarding the sufficiency of the evidence, namely, that the State presented insufficient evidence of penetration. As we have explained, we disagree with that argument and conclude that this claim is without merit.

14

## VIII.  Sentencing

On appeal, the defendant argues that his sentence should have been twenty-five years, the minimum for the convicted offense, rather than thirty-two years, as ordered by the trial court.  The State responds that the sentence should be affirmed.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2014).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012).  We review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

15

In sentencing the defendant, the court explained that it was relying on the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct, information offered by the parties as to mitigation and enhancement factors, and the statement of the defendant during the sentencing hearing. It is clear that the trial court properly considered statutes, case law, and the information specific to the defendant in concluding that the defendant's sentence should exceed the minimum. The court placed great emphasis on the defendant's abusing a position of private trust that he had developed with the victim, as well as the victim's family. The court placed less emphasis on the facts that the defendant had "great difficulty" in school, was being regularly tested for sexual diseases, and had two prior convictions for DUI. Finding three enhancement factors and no mitigating factors, the court exceeded the minimum sentence for the conviction. We cannot conclude that the court erred in this determination.

## IX. Victim Impact Statement

The defendant argues that the trial court erred in allowing the State to "read into the record a victim impact statement written by the alleged victim's mother" which stated:

> [The victim] was exposed to HIV during the many times he was raped. Every three months he has to be taken for a blood test. [He] takes medication on a daily basis to keep from having breakout [sic]. When medication [sic], when he is stressed out, he has breakouts regardless.

After this statement had been read aloud by the State, the defendant objected, arguing that there was no evidence in the record "about what the [victim] has or has not contracted. When questioned by the court as to whether there would be any testimony regarding these assertions, the State provided a negative response.

On appeal, the defendant argues that it was "inappropriate for the trial court to consider this inflammatory statement." However, the defendant makes no references to the record indicating the court did anything other than to allow this statement to be read aloud by the State. Additionally, we note that, during sentencing, the trial court specifically observed that there was no testimony regarding this alleged fact and, as a result, it was "not before the court in its record today." Accordingly, we conclude that the court did not rely upon this claim, and the assignment is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE