IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 11, 2022 Session

## STATE OF TENNESSEE v. RONNIE LEE CLAYBORN

**Appeal from the Criminal Court for Fentress County**
**No. 18-CR-9      E. Shayne Sexton, Judge**
_____

### No. M2021-00656-CCA-R3-CD
_____

Defendant, Ronnie Lee Clayborn, was convicted by a Fentress County jury of rape of a child and incest, for which he received a sentence of twenty-seven years' incarceration. On appeal, Defendant contends that: (1) the State failed to present sufficient evidence to support his convictions beyond a reasonable doubt; (2) the trial court committed plain error by the admission of prior uncharged sex crimes to bolster the victim's testimony; (3) rebuttal testimony from the lead detective infringed upon Defendant's right to remain silent; (4) the trial court erred when it excluded testimony from Defendant's father about text messages sent from Defendant to the victim's mother on the night of the offense; (5) the prosecutor engaged in improper prosecutorial argument; (6) the trial court committed plain error by allowing the use of a facility dog during the testimony of two minor witnesses; (7) he is entitled to plain error relief based on the prosecutors' and the lead detective's repeated use of the term "victim" to refer to the complaining witness; and (8) cumulative error necessitates a new trial. Following a thorough review, we affirm the judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Emily Wright and Evan Wright (on appeal), Jamestown, Tennessee; and Shawn C. Fry, Brett Knight, and Dana A. Looper (at trial), Cookeville, Tennessee, for the appellant, Ronnie Lee Clayborn.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Jared R. Effler, District Attorney General; and Thomas E. Barclay and Apryl Bradshaw, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

At trial, Lisa Cunningham testified that she first met Defendant in Oklahoma in 2012 and that they moved to Tennessee in 2014 and later married. Ms. Cunningham explained that, in Tennessee, she lived with Defendant, her two children from a previous relationship, and Defendant's two children from a previous relationship. She said that her children and Defendant's children got along well and were close in age. She explained that she and Defendant had two additional children together—a son in July 2015 and a daughter in October 2016. Ms. Cunningham said that, during their marriage, they had lived on income Defendant received from disability from the military and that she had anticipated receiving money from a trust fund set up by her grandparents, starting in December 2018. She said that she separated from Defendant in January 2018 and moved back to Oklahoma with her children. She explained that she had no source of income during 2018, until receiving money from the trust fund at the end of the year.

Ms. Cunningham stated that, while living with Defendant in Tennessee, they lived in a three-bedroom home. She explained that her and Defendant's older sons shared one bedroom, their older daughters shared a second bedroom, and that she, Defendant, and the two youngest children shared a third bedroom. When asked about Defendant's relationship with her oldest daughter, E.R.T.,[1] Ms. Cunningham stated that Defendant "seemed to be very interested in being a father figure . . . and paid a lot of attention at first" and that "they got along very well." She said that she noticed, at the end of 2016 or beginning of 2017, that Defendant began to take more interest in E.R.T. Ms. Cunningham explained that Defendant "put more effort into talking with [E.R.T.] [and] being around her more than the other kids." Ms. Cunningham said that she became uncomfortable with the way Defendant hugged E.R.T. Ms. Cunningham testified that, at times, she saw Defendant lying in bed with E.R.T. She said that Defendant told her that he and E.R.T. were "just talking about school" and that E.R.T. "needed someone to talk to[.]" Ms. Cunningham told Defendant that this made her uncomfortable, and Defendant assured her that he would not lie down with E.R.T. anymore.

She recalled a specific incident in 2016, stating:

I was standing in the bedroom with [E.R.T.] and [Defendant's oldest daughter, D.C.,] and [Defendant], and the girls needed to change. And I started walking out of the room so that they could change, and [Defendant] just stood there like he was zoned out or something while they were starting

---

[1] It is the policy of this court to refer to minors and victims of sexual assault by their initials only.

to change, and I went, ["Defendant], you have to get out of the room, you know, the girls need their privacy to change[,"] and he just stood there and looked at me . . . and then he just finally walked out when I told him to, but then I found out later on that he had been doing that quite a bit.

Ms. Cunningham recalled another occasion that she was made uncomfortable by Defendant's behavior towards E.R.T. She stated:

> [Defendant] . . . walked up to [E.R.T.] one time and unsnapped her bra through her shirt which was something that he would commonly do to me even in public. And when I confronted him about it, [Defendant] pretended like he didn't even realize he had done it, like it was an involuntary reaction or something. And - but he said that it was an accident, and he went and apologized to her[.]

Ms. Cunningham testified that, on the night of October 6, 2017, she was at home with their two youngest children and that Defendant took the older children, including E.R.T., to his father's residence in Fentress County to spend the night. She explained that Defendant's father was recovering from surgery and that she had been at the residence on October 5, helping to clean out a bedroom to make space for a hospital bed for Defendant's father. Regarding the contents of the bedroom, Ms. Cunningham testified:

> There was originally a twin size bed that we moved out, there was a vanity in the corner, there was a bright dresser when you walk in the door on the left, and there is a closet in the corner. There was also a toy box, but it was empty. I . . . opened it to see if there [were] any toys in it for the little kids, but there was nothing in it but some leaves and dirt. And we cleaned the room out and then they brought in the hospital bed.

Ms. Cunningham stated that, on the night of October 6, her relationship with Defendant was "a little bit stressed" because Defendant had been away from home for several weeks taking care of his father. She said that they had not been arguing but that she had asked him to "come home for a little bit because we hadn't seen him."

Ms. Cunningham said that Defendant contacted her in the early morning of October 7 via text message. Defendant sent her a text message at 12:39 a.m. that read: "Daddy has been up and down and can't decide whether he's cold or hot, . . . I love you, goodnight[.]" This message was followed by messages at 1:31 a.m. and 1:38 a.m. that read, respectively: "I'm having horrible nightmares, and I'm so sad right now[,]" and "I just awoke from the worst [dream] I've ever had[.]" Then, at 1:40 a.m., Defendant sent Ms. Cunningham a text message that said: "I am so sorry, I will not ever do this again, I need you, I wish I was

there." Ms. Cunningham testified that, at the time, she did not know what Defendant was talking about when he said that he would not "do this again" and that he had nothing to apologize for to her knowledge.

Ms. Cunningham recalled that, later in the day on October 7, 2017, she drove E.R.T. to Arkansas to meet E.R.T.'s father, who was going to take E.R.T. to his home in Oklahoma for fall break. Ms. Cunningham said that E.R.T. did not mention anything to her about the night of October 6, but she testified that, when E.R.T. returned from Oklahoma, she "stayed in her room more and was less playful with the other kids, [and] just seemed very sad[.]" She said that, on December 8, 2017, E.R.T. made a disclosure to her about what happened on the night of October 6. Ms. Cunningham recalled:

> [T]he kids had come home from school and it was dark and it was cold, and [Defendant] told [E.R.T.] that she needed to go out and gather eggs from the chicken coop that we had, and he knew that she was pretty terrified of the chickens because one of them was not very nice, and she was not raised with chickens. But she came back in, and [Defendant] got mad at her because she hadn't brought the eggs back and she explained why. And I told her, I said, well, maybe [D.C.] could help you . . . and then [E.R.T.] just said something like, no, I won't[.]

Ms. Cunningham stated that E.R.T.'s behavior was "very out of the ordinary" because E.R.T. was normally an obedient child. Ms. Cunningham told E.R.T. to go to her bedroom so that they could talk. When Ms. Cunningham tried to talk to E.R.T., E.R.T. was "sobbing" and "kept saying . . . I can't I can't tell you, I can't tell you, . . . almost to the point of hyperventilating." Ms. Cunningham testified that Defendant "kept walking down the hallway and trying to come in the doorway, and I just told him that I needed a few minutes to talk to her because, you know, there is something deeply bothering her." Ms. Cunningham said that, when Defendant stopped coming back to the bedroom, "she finally told me."

In response to E.R.T.'s disclosure, Ms. Cunningham gave E.R.T. her car keys and told her to get dressed, get her brother, and go sit in the car and lock the door. Ms. Cunningham recalled that she then went into the living room where Defendant and Defendant's father were sitting, and she told Defendant's father, "Your son-of-a-b***h son raped my daughter at your house." Defendant responded, "What? No, I didn't[.]"

Ms. Cunningham then took E.R.T. to the hospital and called 911 on the way. She said that a detective and the sheriff met them at the hospital and took a report. She testified that, while at the hospital, E.R.T. was examined and given a pregnancy test "but they did

not do a full examination because their - the child specialist wasn't there." She stated that, after leaving the hospital, she sought an ex parte order of protection against Defendant.

On cross-examination, Ms. Cunningham acknowledged that, when she made the report to police on December 8, she did not mention the instances of Defendant's behavior towards E.R.T. that she testified made her feel uncomfortable. She agreed that she told her divorce lawyer about these instances, however. Ms. Cunningham agreed that, prior to a hearing on the order of protection, she asked E.R.T. to "tell [her] about any instances that came to mind of times that [Defendant] had messed with her so [Ms. Cunningham] could write them down and get them to a detective[.]" She agreed that E.R.T. had a first forensic interview before the hearing on the order of protection and then a second forensic interview after the hearing. Ms. Cunningham testified that E.R.T. also disclosed to her that she had been touched inappropriately by a cousin while in Oklahoma for fall break. She agreed that she had been aware that she was going to receive a sizable amount of money from a trust fund set up by her grandparents beginning in 2018.

On re-direct examination, Ms. Cunningham said that, prior to E.R.T.'s disclosure, she had no intention of filing for divorce from Defendant despite various issues in their marriage. She stated that, during the marriage, Defendant had "anger management issues" and struggled with an addiction to narcotic pain pills. Ms. Cunningham denied that she had wanted to divorce Defendant and testified that she tried to help Defendant by keeping his pills and only giving him the prescribed amount but that Defendant would take pills from his father. She said that she only filed for divorce because Defendant "raped [her] daughter."

Detective Jason Duncan with the Fentress County Sheriff's Department (FCSD) testified that he received a call on December 8, 2017, asking that he respond to Fentress County Hospital in reference to a reported rape. Detective Duncan said that he met Sheriff Michael Reagan at the hospital and then spoke to E.R.T. and her mother, Ms. Cunningham. He conducted a "minimum facts interview" to obtain basic facts from E.R.T. about the allegation. Detective Duncan said that he arranged a forensic interview for E.R.T. at the Children's Center of Fentress County for December 12, 2017, and that Ms. Cunningham scheduled E.R.T.'s forensic medical examination. Detective Duncan stated that he also made a referral to the Department of Children's Services that night while patrol officers served Defendant with the ex parte order of protection.

Detective Duncan stated that the hearing on the order of protection took place on December 13, 2017, and that, after the hearing, he asked Defendant "if he would be willing to come in and speak to me[.]" At this point in his testimony, defense counsel raised an objection and requested a jury-out hearing. During the jury-out hearing, defense counsel objected to any testimony from Detective Duncan that Defendant refused to take a

polygraph test. The State responded that Detective Duncan had been instructed not to mention anything about a polygraph test and that the State simply intended to ask if he "took a statement from [D]efendant" to which the answer "would be no." The trial court sustained the objection because "the danger of this entire line [of questioning] is far greater than any benefit that might come from it," and it noted that commenting on Defendant's failure to give a statement could create a Fifth Amendment issue. When the jury returned, the State moved Detective Duncan's testimony to a different topic.

On cross-examination, Detective Duncan acknowledged that he did not obtain a copy of Ms. Cunningham's 911 call and that he did not obtain a written or recorded statement from Ms. Cunningham. He also acknowledged that he did not go to the crime scene to collect evidence and did not interview anyone that had been in the residence the night of the offense. Detective Duncan explained, "[I]t was too much removed from the actual incident. I never thought to go back to the residence to check for any evidence." Detective Duncan recalled that E.R.T. had a second forensic interview on December 18. He explained that E.R.T. alleged that Defendant wore an orange condom during the offense, so he collected a box of condoms from Ms. Cunningham's residence. He agreed, however, that none of the condoms in the box were orange.

Detective Anthony Gunter of the FCSD testified that he served Defendant with the ex parte order of protection on December 8, 2017. Detective Gunter recalled that Defendant met him in the driveway of the residence, put his hands out, and said, "[G]o ahead and arrest me or take me to jail[.]" Detective Gunter said that he asked if Defendant could leave the residence because Ms. Cunningham and the children had nowhere to go and that Defendant agreed to go to his father's residence.

FCSD Deputy Jason Gunter testified that he assisted Detective Gunter in serving Defendant with the ex parte order of protection. Deputy Gunter said that, when Defendant learned of the allegations against him, he said that he "didn't do it" and "she's lying." Defendant then commented, "[E]ven if she wasn't lying, I would still have to believe her."

Prior to the testimony of the next witness, the transcript reflects that the following occurred:

> [THE STATE:] I believe that we have an agreement for the use of Lucia, and we're just making sure.

> THE COURT: That's the facility animal; is that correct?

> [THE STATE:] Yes, your Honor.

- 6 -

(Whereupon, the facility animal was brought into the Courtroom to sit beside the next witness.)

Defendant's thirteen-year-old daughter, D.C., testified that she currently lived with her mother and stepfather but that she lived with Defendant in 2017. She said that, during this time, she shared a room with E.R.T. and that they did not get along well. D.C. explained that she felt that Defendant and Ms. Cunningham treated E.R.T. better than her and that Defendant paid more attention to E.R.T. She testified that she and E.R.T. had bunkbeds in their shared room and that there were times that Defendant got into bed with E.R.T. on the bottom bunk. D.C. asked Defendant about why he got in bed with E.R.T., and he told her E.R.T. "wanted to talk to him and she didn't want to talk to him in front of [D.C.]"

D.C. recalled testifying at the order of protection hearing and agreed that it was "a pretty rough day." The following exchange then occurred:

> [THE STATE:] Do you recall a tape being played where you had been previously recorded?
>
> [D.C.:] Yes.
>
> [THE STATE:] Was that an emotional moment for you?
>
> [D.C.:] Yes.
>
> [THE STATE:] Before that tape was played, [were] there things you said in that hearing that maybe weren't completely true?
>
> [D.C.:] I don't really remember everything that I said to be honest. I just remember being really confused about a lot of things, and I didn't know the whole story so.
>
> [THE STATE:] Well, did anyone ever tell you that there were things you could say or couldn't say at that hearing?
>
> [D.C.:] I was told not to say anything that made [Defendant] sound bad, like it was just like a lot of pressure from all that side of the family really.
>
> [THE STATE:] Did [Defendant] tell you that as well?
>
> [D.C.:] Yes.

[THE STATE:] Because of that, did you lie about some things in your testimony that you thought would make your dad look bad if you told the truth?

[D.C.:] Yes.

D.C. testified that she spent the night at Defendant's father's residence on October 6, 2017. She said that there were two bedrooms in the residence. She recalled that Defendant's father slept in a recliner in the living room that night while E.R.T. slept in the hospital bed in the spare bedroom and she slept on a mattress on the floor beside the hospital bed. D.C. recalled that, initially, both she and E.R.T. were lying in the hospital bed talking when Defendant came into the room. Defendant got in bed with them and then told D.C. to move onto the mattress on the floor. D.C. said that she fell asleep while Defendant was still in bed with E.R.T. She testified that Defendant woke her up "in the middle of the night" and told her that he was moving to the couch. D.C. said that, when she woke up the next morning, E.R.T. did not say anything to her about the previous night.

Regarding the night that E.R.T. disclosed the abuse, D.C. explained:

So [Defendant] told me and [E.R.T.] to go and get the eggs out of the chicken coops, and we went outside and I got the eggs, and I came back, and I asked, [E.R.T.], I was like, did you get the eggs and she said no. And so, we went in the house. And then she was -- she smarted off to [Defendant] and so, [Ms. Cunningham] told her to go back in the bedroom and then that's whenever everything went down.

D.C. recalled that she was in the living room with Defendant and Defendant's father when Ms. Cunningham entered the room and told her to leave the room. D.C. went to her bedroom where she saw E.R.T. getting clothes out of the closet. D.C. said that E.R.T. was crying "really bad[.]" Ms. Cunningham then told D.C. to call her mother to pick her up.

During cross-examination, the following exchange occurred between D.C. and defense counsel:

[DEFENSE COUNSEL:] Now, some of other attorneys [at the order of protection hearing] weren't so nice to you, attorneys that are not here in this room today, correct?

[D.C.:] Yes.

[DEFENSE COUNSEL:] When you had to testify previously, and I'm not gonna ask what it was, but were you asked something very embarrassing?

[D.C.:] Yes.

[DEFENSE COUNSEL:] Did you cry?

[D.C.:] Yes.

[DEFENSE COUNSEL:] Because of the attorney?

[D.C.:] Yes.

D.C. testified that she was asleep and did not hear or see anything that happened between E.R.T. and Defendant the night of the offense, even though she was sleeping on the floor right beside the hospital bed. She said that the spare bedroom they were in was small. D.C. recalled an ottoman that they stored toys inside, which they referred to as the toy box. She said that the toy box was not in the spare bedroom on the night of October 6. She further said that the toy box was heavy and that no one could have picked up the toy box and carried it over the corner of the mattress on the floor while she was sleeping there without waking her up. D.C. acknowledged, however, that she had been only eight or nine years old when she attempted to pick up the toy box. D.C. identified a photograph of the bedroom door and agreed that the door had an old "skeleton[-]type key" lock on it. She stated that she had never locked the door and had not known the location of the key. D.C. said that E.R.T. never said anything to her about the offense prior to the disclosure to Ms. Cunningham. D.C. recalled that, sometime in November 2017, E.R.T. got in trouble after Defendant found pornography on her cell phone. D.C. testified that Defendant took the cell phone away from E.R.T. as punishment.

During cross-examination, defense counsel asked D.C. if she wanted to pull the facility dog closer to her, and the record reflects that the witness pulled the dog under her chair. At the close of D.C.'s testimony, the trial court provided the jury with the following instruction:

The law allows either the prosecution or the [d]efense to use a facility dog during the testimony of witnesses. This dog is not a pet, does not belong to any witness. It is a highly trained professional animal available for use by either side. The presence of a facility dog is in no way to be interpreted as reflecting upon the credibility of any witness. You may not draw any inference, either favorably or negatively, for or against either the prosecution or the [d]efense because of the dog's presence and should attach no

significance to the use of a facility dog by any side or witness. You also may not allow any sympathy or prejudice to enter into your consideration of the evidence during deliberations merely because of the use of a facility dog. And I will give you that same instruction in the final instructions as we proceed.

The following day of trial, the State informed the court that the first witness of the day would also involve the use of the facility dog. The court stated that it would remind the jury of the court's instruction regarding the facility dog.

Fourteen-year-old E.R.T. testified that she was born in February 2005. She stated that she currently lived in Oklahoma with her father but that, in 2017, she had lived with her mother and her stepfather, Defendant, in Tennessee. E.R.T. stated that she and her stepsister, D.C., shared a bedroom; they slept in bunk beds with E.R.T. taking the bottom bunk. She said that she was initially shy around Defendant but that she eventually got "used to him[.]" She testified that Defendant was nice to her and that he took her and her siblings to movies, played games with them, and gave them candy.

E.R.T. testified, however, that Defendant sometimes made her feel uncomfortable. She explained that Defendant would walk into the room she shared with D.C. while they were changing clothes. She said that they would tell Defendant to "get out" but that he would "just stand there and watch [them]." E.R.T. explained that Defendant would occasionally try to hold her hand or put his hand on her thigh while she was in his truck with him after school. She also stated that Defendant would snap or unhook her bra, which made her "very uncomfortable." E.R.T. said that, at times when in bed with her, Defendant would put his hands on the sides of her body "or try to put his hand down [her] pants or up [her] shirt." She explained that she would "shift around like I was uncomfortable with my sleeping position" and that Defendant would remove his hands.

E.R.T. stated that on the first night of her fall break, October 6, 2017, when she was twelve years old, she spent the night at Defendant's father's residence. She said that it was a two-bedroom residence and that her brother and stepbrother slept in Defendant's father's bedroom, she and D.C. slept in the spare bedroom, and Defendant and Defendant's father slept in the living room. She stated that there was a hospital bed in the spare bedroom and that she and D.C. were lying the hospital bed when Defendant came into the room. Defendant got into the bed with them in between E.R.T. and D.C. Defendant then told D.C. to move off the hospital bed onto a mattress in the floor. He told D.C. goodnight and left the room, leaving E.R.T. to sleep in the hospital bed.

E.R.T. testified that she and D.C. continued to talk for a while but that, eventually, D.C. said that she was "gonna go to sleep because she was really tired." When E.R.T. began to fall asleep, she heard the bedroom door open. She testified:

> I could only see from the TV light because there was a big TV and [Defendant's father's] recliner was in front of it, and there was no other lights on. So I could see [Defendant] from the doorway, and I could tell that he didn't have any shorts on because of the ruffles in his shirt.

> . . . .

> I could see [Defendant], and he opened a little small piece of wrapping which I later noticed that it was a condom.

> . . . .

> He tore off the wrapping around it, and he pulled down his underwear . . . onto his thighs, and he put [the condom] on his penis.

She said that Defendant closed the bedroom door and walked over to the hospital bed. E.R.T. explained that she "tried to look at the wall to see if maybe he would go away" but that she felt Defendant climb onto the bed behind her. She said that Defendant slid his hands on her hips and began "rubbing [her] sides[.]" While pretending to be asleep, E.R.T. shifted her position hoping that Defendant would remove his hands. Instead, Defendant put his hands into her pajama pants and pulled the pants and her underwear down to her knees. E.R.T. testified that she "froze" and did not know what to do because she was scared. She agreed that she had previously testified that Defendant held her arms behind her back but said that she was unsure if her arms were behind or in front of her. She said that Defendant put his penis into her vagina and started "thrusting into [her]." She explained that she felt a "tearing pain" in her vagina. She stated that she tried to scream but that Defendant put his hand over her mouth and "stopped the noise." She recalled that, after a final forceful thrust, Defendant stopped and left the bedroom.

E.R.T. continued:

> I didn't move. After he left I started crying and when I realized what happened and then after a couple minutes after he closed the door, I got up and tried to move -- there was a black toy box that was near the window, and I started pushing it, but it was really loud, and I was afraid it could wake up [D.C.], so I picked it up and sat it in front of the door.

- 11 -

She said that the toy box was empty but "slightly heavy[.]"  She testified that she stepped over the corner of the mattress on the floor and that D.C. did not wake up during this time.  E.R.T. said that she also latched a lock on the bedroom door, which she described as "a hook and a hole where you can just pick up the hook and set it through the hole."  E.R.T. recalled that, as she attempted to go back to sleep, Defendant came back to the door and tried unsuccessfully to unlatch it.  She estimated that the rape happened around 9:00 p.m., explaining that she looked at her phone after Defendant left the room and it was 9:05 p.m.

E.R.T. testified that she told no one about the incident the following day.  She said that she moved the toy box back to its original location before she woke up D.C.  Later that day, her mother drove her to Arkansas so that E.R.T. could spend fall break with her father.  She testified that she was afraid to tell her father about Defendant's assault and thought that he might try to take her away from her mother.  E.R.T. said that, after fall break, she tried to avoid Defendant as much as possible.  She agreed, however, that she told Defendant that her cousin touched her inappropriately while she was in Oklahoma.  She said that the cousin tried to touch her under her clothes but that he was unsuccessful.

She testified that in November, Defendant found pornography on her cell phone and took the phone away from her.  She explained that she had looked at the pornography to try to "figure out . . . what had happened to me."  She said that she was afraid that she "might get in trouble, you know, being that young and asking about it."  E.R.T. testified that Defendant grounded her and took away her cell phone.  She said that Defendant did not inform Ms. Cunningham about the pornography or about his taking E.R.T.'s phone.  She agreed that it was a secret between Defendant and her and that she did not tell her mother about it.  E.R.T. said that she was upset by the punishment but that Defendant returned her phone after a set time.

E.R.T. recalled that, on the night of December 8, 2017, Defendant told her to go outside and get eggs from the chickens.  She was angry at Defendant because she was afraid of the chickens, and it was dark and cold outside.  She stated that she put on boots and a jacket and went outside but refused to collect the eggs.  When she came back inside the house, she told Defendant that she did not get the eggs.  E.R.T. said that she was normally not disrespectful to Defendant and that Ms. Cunningham told her to go to the back bedroom.  She testified:

> I was just upset with trying to keep the thing that happened to me, the rape, and not telling my mom this.  It was just even like entering into my head, and it just -- it just hurt me immensely.
>
> . . . .

- 12 -

And when my mom sent me to her room to talk to me, I just broke down, and I told her that I was sorry for being really mean, but there was something I needed to tell her, but I was too scared to. And then, after a couple times of her reassuring me, I told her about it. I didn't go into details, I just told her that [Defendant] had raped me.

E.R.T. recalled that she was "crying so hard" because of the pain and stress she felt. She said that Ms. Cunningham gave her the keys to the car and told E.R.T. and her siblings to go wait in the car. Ms. Cunningham then drove them to the hospital and called 911 on the way.

On cross-examination, E.R.T. said that she had previously testified about the offense during the order of protection hearing. She also recalled taking part in two forensic interviews—one before her testimony at the hearing and one after. E.R.T. was asked about differences between her forensic interviews and her testimony during trial. Specifically, the following exchange occurred:

[DEFENSE COUNSEL:] But today, you're saying you just froze, that he didn't pull . . . your arms behind your back, correct?

[E.R.T.:] I'm sure he did pull my hands behind my back, but I froze, and I was trying to process what was happening.

She said that she initially described resisting Defendant rather than freezing because she felt disappointed in herself. She acknowledged that in her forensic interview she reported that she told Defendant to stop before he covered her mouth. She said that she could not remember some of the finer details about the rape because she had tried to forget the painful memories from two years earlier.

Hollye Gallion testified as an expert witness in the field of pediatric forensic medical evaluations. Ms. Gallion explained that she worked as a pediatric nurse practitioner with Our Kids Center in Nashville. Ms. Gallion said that she provided services to E.R.T. on December 12, 2017, after she received a referral from a detective with the FCSD. Ms. Gallion testified that E.R.T. told her Defendant, her stepfather, had sexually assaulted her. Ms. Gallion explained specifically that E.R.T. disclosed that Defendant's "penis went inside her vagina or her genital area." Regarding the timing of E.R.T.'s disclosure, Ms. Gallion stated, "Most children do not disclose that something has happened to them right after, so the vast majority of kids we see, it's weeks, months or years from the last time anything reportedly occurred with them." She said, "I think children often don't have the language to describe it, they don't want to disrupt families, they care about the person."

- 13 -

She further testified that it was normal for child victims of sexual abuse to make ongoing disclosures about what happened to them.

Ms. Gallion testified that she performed a complete physical examination of E.R.T., including an examination of her vagina. Ms. Gallion said that E.R.T. had a "normal healthy exam" and that she did not see any injuries or signs of infection. She explained that because the physical examination took place two months after the sexual assault, she "wouldn't expect to see any injuries that far out."

David Andrews testified that he was a deputy in Putnam County for twenty-six years and sheriff for twelve years. He said that, after he retired, he opened a private investigation business in December 2014. Mr. Andrews testified that he had specialized training as a child abuse investigator and that he had investigated child sex abuse cases many times in his career. Mr. Andrews testified that it was "vital" to corroborate the allegations made by a victim in such cases. Regarding how the case should have been investigated, Mr. Andrews stated:

> I'd do photographs and a drawing just like we've done here. I would collect in this kind of case the sheets, clothes, anything on their person that would have any kind of evidence at all. Oftentimes you measure from wherever you start from to wherever you're going for a search warrant. You'd certainly collect -- the accused['s] statement would be part of the evidence[.]

The following exchange then occurred:

> [DEFENSE COUNSEL:] How vital is it to contact the accused?
>
> [MR. ANDREWS:] I can't imagine not.
>
> [DEFENSE COUNSEL:] How vital is it to go to the scene?
>
> [MR. ANDREWS:] I can't imagine not going to the scene.
>
> . . . .
>
> [DEFENSE COUNSEL:] And how vital is it to interview witnesses who would have been present at the scene?

[MR. ANDREWS:] Again, it's vital to talk to anybody and everybody that would have any knowledge of anything no matter how big or small.

He said that defense counsel contacted him and asked that he take measurements of the spare bedroom at Defendant's father's residence. Mr. Andrews went to Defendant's father's residence the week before trial and made measurements of the spare bedroom. He provided the measurements to defense counsel, who then made a diagram of the bedroom. Mr. Andrews said that, according to his measurements, the recliner in the living room was about three feet from the bedroom door, which was about six feet from the hospital bed. On cross-examination, Mr. Andrews acknowledged that the spare bedroom and Defendant's father's recliner were "staged" for his visit.

Hannah Stevens testified that Defendant and Defendant's father were her cousins. She stated that she helped clean out the spare bedroom at Defendant's father's residence before he came home from the hospital. Ms. Stevens said that, when she cleaned the residence, she removed the toy box from the spare bedroom and took it to the dump. She recalled that she slid the toy box through the residence and out onto the front porch and then two boys helped her put the toy box on a trailer to be hauled away. She said that she had to slide it because she was unable to pick it up and carry it. She said that the toy box was "[n]ot necessarily heavy, it was just big and falling apart." Ms. Stevens testified that she removed the toy box from the spare bedroom at the end of September 2017, explaining that Defendant's father was having heart surgery in October and "needed it to be done before October." She said that she removed the toy box before the hospital bed was delivered and put in the spare bedroom.

Defendant's father testified that, before the hospital bed was placed in the spare bedroom, there had been a toy box in the bedroom. He said that he had been in the hospital for about two weeks and that Ms. Stevens had cleaned the spare bedroom and removed the toy box before he came home. Defendant's father said that there had never been a lock as described by E.R.T. on the spare bedroom door.

Defendant's father testified that, when he first came home after being in the hospital, he was recovering from surgery. He stated that he was hurting "a little" and that he was "up and down" the night of October 6, 2017. The following exchange then occurred:

[DEFENSE COUNSEL:] Let me show you what's previously been marked as Exhibit 1 about some text messages.

[DEFENDANT'S FATHER:] Now, I can't read them. I can't even see them good enough to read them.

- 15 -

[DEFENSE COUNSEL:] All right. Let me have it back then and let me read this text. The question I've got for you is about you being up and down. If there is a text from [Defendant] that says –

[THE STATE:] Objection, your Honor. If he has -- he has not laid any sort of foundation for any personal knowledge about this text conversation between [Defendant] and [Ms. Cunningham].

. . . .

[DEFENSE COUNSEL:] Judge, the question isn't about the knowledge of the text. The question is, is if his son said he'd been up and down and can't decide whether he's hot or cold -- is that true that that night he had been up and down and didn't know whether it was hot or cold, is that true about his condition, because the condition is about him.

THE COURT: Well, that is – the declarant is the son?

[DEFENSE COUNSEL:] No.

[THE STATE:] Yes, your Honor.

THE COURT: And the -- the declarant is the son.

[DEFENSE COUNSEL:] Yes.

THE COURT: How is that not hearsay?

[DEFENSE COUNSEL:] Judge, it's --

THE COURT: It's being offered to prove the exact same thing that's being said on that statement.

[DEFENSE COUNSEL:] And it's been testified to as Exhibit Number 1 which came in without objection.

. . . .

THE COURT: . . . I'm gonna sustain the objection. I think there's a proper way to maybe get to that without getting into the text message itself.

- 16 -

[DEFENSE COUNSEL:] Okay.  I'm gonna move on, your Honor.

Defendant's father testified that he slept in a recliner in his living room on the night of the alleged offense.  He stated that he did not see or hear anything that night to cause him to suspect that a rape had occurred in the spare bedroom "within a few feet" of his recliner.  Defendant's father said that Defendant slept on an oversized chair in the living room and that his grandson and step-grandson slept together on the living room couch.

On cross-examination, Defendant's father stated that he did not remember what date he entered the hospital or what day he returned home.  He said that he was "up a lot" on the night of October 6.  Defendant's father admitted that Defendant went into the spare bedroom with D.C. and E.R.T. before they went to sleep.  "After a while," Defendant returned to the living room and watched television with his father.  Defendant's father initially testified that he left the spare bedroom exactly the way that it had been the night of October 6, and he claimed that nothing was altered before Mr. Andrews took measurements and photographs of the bedroom.  Defendant's father then clarified that the furniture had not been repositioned but that a hamper in the bedroom had been used and moved around.  He also admitted that he had asked D.C. about the location of the mattress and that he had moved the spare mattress back to the floor for Mr. Andrew's photographs.

At the close of Defendant's proof, the State indicated that it wanted to recall Detective Duncan as a rebuttal witness.  The State explained:

When [D]etective Duncan was testifying in our case in chief, the [d]efense objected because they thought I was going to lead him into trying to ask him about a polygraph and not making statements and so forth, which I didn't and that was clear.  Nothing about that came out.  The State did not present anything at all about [D]efendant being questioned or refusing to make a statement during our case in chief.  However, during defense proof, [d]efense counsel brought out at some length through their witness, [Mr.] Andrews, about what was proper.  And part of their defense from the beginning, from the opening arguments has been lack of proper investigative techniques on the part of this officer.  And he had their witness testify in more than one fashion that it was vital, to use his word, for an investigator to question the accused.  I feel he has opened the door for that, and we would like to call [D]etective Duncan for the limited purpose of saying that he did attempt to talk to the accused and that the accused did not give a statement.  No mention of a polygraph, but I think they have opened the door for us to talk about that issue.

- 17 -

Defense counsel responded that "Detective Duncan, quite candidly and quite honorably, mentioned that he just kind of dropped the ball and didn't interview any witnesses, your Honor. And to single out [D]efendant is only singling out his silence, which it's his constitutional right to do." The following exchange then took place:

[THE STATE:] . . . [H]e had a witness testify that it is vital in this type of investigation to talk to the accused. That was his words. And again, in so doing, he's implying that this officer is derelict by not even making an attempt.

. . . .

[DEFENSE COUNSEL:] The only question that was asked of [Defendant was] will you take a polygraph.

THE COURT: Well, okay. I think it's fair game in rebuttal that the -- it was made very clear through [Mr.] Andrews that it was vital to attempt to reach out to [D]efendant. I mean, that's -- that was a great deal of his testimony. Now, how -- certainly, polygraph is way off base. I think it would be a fair question to ask if there was if this officer approached [D]efendant.

[THE STATE:] Your Honor, our understanding is, and I think the testimony would be that [Defendant] said he wanted to discuss with his lawyer before he talked to the officer, [the officer] handed him his business card and said, if you change your mind, contact me.

THE COURT: Now, where did the polygraph conversation occur?

[THE STATE:] It was at that same time.

THE COURT: The same time, but that's the other side of the conversation.

[THE STATE:] I understand that's completely inadmissible.

. . . .

THE COURT: Well, the point that you're trying to make . . . and the [d]efense is trying to refute is that this officer tried to do his job, right?

[THE STATE:] Exactly.

- 18 -

THE COURT: I'm gonna permit the limited examination of did this officer approach [D]efendant. Stop right there. I'm not gonna -- any response, anything from that is irrelevant, but it does refute the [d]efense's . . . attack . . . o[n] the law enforcement efforts in this case. I think it's fair game. It was made a great deal in [d]efense proof, and I'm gonna allow the officer to testify that he did make the attempt, but that's it. We're not gonna go further. We won't go into what was said, even that the defendant exercised his Fifth Amendment right. It -- it is he just made the contact.

Detective Duncan was then recalled by the State. He agreed that Mr. Andrews had testified "that it would be vital for an investigator to speak with the accused[.]" The State then asked, "[D]id you ever at any point approach [Defendant] and make an attempt to speak to him about this case?" Detective Duncan answered, "Yes, sir." The State then asked, "When and where did that happen?" The detective replied, "It happened here at the Justice Center immediately following the order of protection hearing."

Following deliberations, the jury convicted Defendant of rape of a child and incest. At a subsequent sentencing hearing, the trial court sentenced Defendant, as a standard offender, to twenty-seven years with a one hundred percent release eligibility for rape of a child and to five years with a thirty percent release eligibility for incest. The court then merged Defendant's conviction for incest into the conviction for rape of a child.

Defendant filed a timely motion for new trial and an amended motion for new trial. Following a hearing, the trial court denied the motion for new trial in a written order. This timely appeal follows.

## II. Analysis

### A. Sufficiency of the evidence

Defendant asserts that the State failed to present sufficient evidence to support his convictions beyond a reasonable doubt. He argues that there are such serious concerns about E.R.T.'s credibility that no rational trier of fact could believe her testimony. The State responds that the evidence is sufficient to support Defendant's convictions for rape of a child and incest.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence

are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). Tennessee courts have consistently held that the testimony of a victim alone can be legally sufficient to support a conviction. *State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003); *see State v. Joseph Jason Qualls*, No. W2019-01083-CCA-R3-CD, 2020 WL 4346803, at *3 (Tenn. Crim. App. July 28, 2020) (citing post-*Elkins* cases) (no perm. app. filed).

At the time of the offense, Tennessee Code Annotated section 39-13-522 defined rape of a child as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2017). As relevant here, "[a] person commits incest who engages in sexual penetration as defined in § 39-13-501, with a person, knowing the person to be, without regard to legitimacy . . . [t]he person's . . . stepchild[.]" Tenn. Code Ann. § 39-15-302(a)(1) (2017). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2017).

When viewed in the light most favorable to the State, the evidence established that, on October 6, 2017, when E.R.T. was twelve years old, she spent the night at the residence of Defendant's father. Her mother was not there, but her stepfather, Defendant, was there along with her brother, stepsiblings, and Defendant's father. E.R.T. testified that, while she and D.C. lay together in a hospital bed in the spare bedroom, Defendant came into the room and got into the bed between them. Defendant then told D.C. to move off the hospital bed onto a mattress on the floor, and Defendant eventually left the room. As E.R.T. was beginning to fall asleep, she heard the bedroom door open. She saw Defendant open a condom wrapper, pull down his underwear onto his thighs, and put the condom on his penis. Defendant then closed the bedroom door and climbed into the hospital bed behind E.R.T. Defendant slid his hands on her hips and began "rubbing [her] sides[.]" E.R.T.

- 20 -

pretended to be asleep and shifted her position hoping that Defendant would remove his hands. Instead, Defendant put his hands into her pajama pants and pulled the pants and her underwear down to her knees. E.R.T. testified that she "froze" and did not know what to do because she was scared. She said that Defendant put his penis into her vagina and started "thrusting into [her]." She explained that she felt a "tearing pain" in her vagina. She stated that she tried to scream but that Defendant put his hand over her mouth and "stopped the noise." She recalled that, after a final forceful thrust, Defendant stopped and left the bedroom. Following the offense, Defendant sent E.R.T.'s mother a series of text messages. In one text message, Defendant made the following unprompted and otherwise inexplicable apology: "I am so sorry, I will not ever do this again[.]"

Defendant contends that no rational trier of fact could believe E.R.T.'s testimony because she did not disclose the rape for two months and because there was no physical evidence to support her testimony. However, Ms. Gallion, an expert in the field of pediatric forensic medical evaluations, testified that most minor victims of sexual abuse "do not disclose that something has happened to them right after" and that it could be "weeks, months[,] or years" before a disclosure is made. She further stated that it was normal for child victims of sexual abuse to make ongoing disclosures about what happened to them. Moreover, Ms. Gallion explained at length why she would not expect to see physical injuries to E.R.T. two months after the rape.

Defendant contends that E.R.T.'s testimony was unbelievable because it was inconsistent with her prior statements during her forensic interviews and her prior testimony at the order of protection hearing. In his brief, Defendant points to the following as inconsistencies: (1) E.R.T. testified at trial that she "froze" during the rape, but she said during the forensic interview that she tried to fight back; (2) E.R.T. testified that she tried to scream, but during her forensic interview, she stated that she told Defendant to stop; and (3) E.R.T. testified at trial that her arms were in front of her chest, but she told the forensic interviewer that Defendant held her arms behind her back. We note, however, that E.R.T. was questioned about these alleged inconsistencies, and she offered explanations for them. She acknowledged that, during her forensic interview, she said that she told Defendant to stop before he covered her mouth and that she initially described resisting Defendant rather than freezing. She explained that she told the forensic interviewer this because she had been ashamed of her own helplessness. Regarding whether Defendant held her hands behind her back, E.R.T. explained that she could not remember some of the finer details about the rape because she had tried to forget the painful memories from two years earlier. Because E.R.T. explained the inconsistency between her testimony and prior statements, Defendant's reliance on the cancellation rule is misplaced. *See State v. Matthews*, 888 S.W.2d 446, 450 (Tenn. Crim. App. 1993) (stating that the "rule of cancellation applies only when inconsistency in a witness' testimony is unexplained and when neither version of his testimony is corroborated by other evidence."). Moreover, E.R.T. never gave

contradictory testimony about the salient fact that Defendant sexually penetrated her the night of October 6, 2017.

Defendant argues that E.R.T. was not believable because her testimony about the toy box and the lock on the spare bedroom door was contradicted by other witnesses. Although D.C. and Defendant's cousin testified that the toy box was not in the spare bedroom on the night of the offense, Ms. Cunningham testified that she had seen the toy box in the bedroom a day or two before the rape and that it had been empty, as described by E.R.T. Faced with this conflicting testimony, the jury was entitled to choose which witnesses it found credible. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008). In the same way, the jury could have accredited E.R.T.'s testimony regarding the existence of the lock on the bedroom door over that of other witnesses. The jury witnessed E.R.T.'s demeanor throughout the trial and was in the best position to evaluate her credibility. Based on the guilty verdict, the jury chose to believe her testimony. Such a verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Bland*, 958 S.W.2d at 659 (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). "Furthermore, a jury's verdict will not be overturned unless there are inaccuracies or inconsistencies that 'are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt.'" *Elkins*, 102 S.W.3d at 582-83 (quoting *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). In this case, any inconsistencies in E.R.T.'s testimony were not such as to create a reasonable doubt as to Defendant's guilt. Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found Defendant guilty beyond a reasonable doubt of rape of a child and incest. We affirm Defendant's convictions.

### B. Rule 404(b) evidence

Defendant contends that the trial court erred when it allowed the State to introduce testimony about prior "uncharged sexual acts" that were allegedly committed by him against E.R.T, as well as testimony about his prior drug use, anger issues, and theft from relatives. Defendant contends that the testimony was "blatant propensity evidence" prohibited by Tennessee Rule of Evidence 404(b), that it prejudiced the defense, and that it resulted in the denial of his right to a fair trial. The State responds that Defendant waived the issue by failing to raise contemporaneous objections and that he cannot establish plain error.

In his brief, Defendant argues that the following testimony related to "uncharged sexual acts" and should have been excluded under Rule 404(b): (1) testimony from Ms. Cunningham and E.R.T. that Defendant unhooked or snapped E.R.T.'s bra; (2) testimony from Ms. Cunningham, D.C., and E.R.T. that Defendant began getting into bed with E.R.T.; (3) testimony from E.R.T. that Defendant held her hand and placed his hand on her

thigh while in his truck together; (4) testimony from Ms. Cunningham and E.R.T. that Defendant attempted to watch E.R.T. change clothes; and (5) testimony from E.R.T. that, at times when in bed with her, Defendant would put his hands on the sides of her body "or try to put his hand down [her] pants or up [her] shirt." Defendant additionally argues that the trial court improperly admitted testimony from Ms. Cunningham that he had "anger management issues," an addiction to pain pills, and that he took pain pills from relatives.

First, as noted by the State, Defendant waived this issue by failing to raise a contemporaneous objection under Rule 404(b) to any of the evidence now challenged on appeal. *See* Tenn. R. App. P. 36(a); *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010). Prior to trial, Defendant filed a Motion for Pretrial Written Notice of Any Impeaching Evidence Relating to the Accused Pursuant to Rules 608(a), 608(b)(3), and 609(a)(3), to which the State filed a response stating that it had fully complied with this request by the filing of its Response to Discovery Request and Pre-Trial Requests, Notices and Demands. On appeal, Defendant argues that his pretrial motion for notice of impeachment evidence should be interpreted as an objection to all Rule 404(b) evidence. This argument is unavailing. Defendant's pretrial motion makes no mention of Rule 404(b) and clearly concerns impeachment evidence. Moreover, an adverse pretrial ruling only removes the need for a contemporaneous objection to the specific evidence covered by the pretrial ruling. *State v. McGhee*, 746 S.W.2d 460, 463 (Tenn. 1988). And, unlike impeachment evidence, the State is not required to give pretrial notice of its intent to introduce evidence under Rule 404(b). *State v. Robert Hurst*, No. E2012-01409-CCA-R3-CD, 2013 WL 5371960, at *17 (Tenn. Crim. App. Sept. 24, 2013), *perm. app. denied* (Tenn. Mar. 5, 2014).

Although Defendant waived plenary review of this issue, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

In this case, Defendant has not shown that he is entitled to plain error relief. Defendant correctly notes that the Tennessee Supreme Court has long refused to recognize a "sex crimes exception" to the prohibition imposed by Rule 404(b). *State v. Rickman*, 876 S.W.2d 824, 827-29 (Tenn. 1994) (citing *State v. Burchfield*, 664 S.W.2d 284, 287 (Tenn. 1984)). However, with the possible exception of the testimony from E.R.T. that Defendant had previously tried to put his hand down her pants or up her shirt while lying in bed with her, the testimony complained of by Defendant on appeal does not rise to the level of uncharged sex crimes. In any event, the State offered the testimony about Defendant's behavior towards the victim as proof that he groomed E.R.T. by normalizing the exact behavior that ultimately prefaced the rape. This court has held that evidence of a defendant's "grooming of a victim" is admissible, including evidence of "bad acts committed during or in preparation for the charged offense." *See, e.g., State v. Nathan*

*Allen Wallace*, No. W2018-01649-CCA-R3-CD, 2020 WL 768731, at *7 (Tenn. Crim. App. Feb. 14, 2020) (explaining that "the concept of 'grooming' is one that has been recognized by the courts of this state as well as other jurisdictions and is properly admitted through evidence of a defendant's bad acts to gain favor or gain access to a victim"), *perm. app. denied* (Tenn. June 5, 2020); *State v. Daniel Pottebaum*, No. M2007-02108-CCA-R3-CD, 2008 WL 5397848, at *9-10 (Tenn. Crim. App. Dec. 30, 2008), *perm. app. denied* (Tenn. June 1, 2009).

Additionally, as noted by the State, Ms. Cunningham's testimony about Defendant's problems with pain pills and "anger management issues" was elicited to rebut an insinuation raised during cross-examination that Ms. Cunningham may have encouraged false allegations against Defendant to use in a divorce proceeding so that Ms. Cunningham could have sole access to the money she was to begin receiving from a trust fund the following year. In response, Ms. Cunningham testified that, despite the issues in her marriage to Defendant, she had not divorced nor intended to divorce him until he raped E.R.T. Ms. Cunningham's testimony was isolated, and a review of the transcripts shows that the State did not repeat or reference the testimony thereafter.

We conclude Defendant has not shown that a clear and unequivocal rule of law was breached or that consideration of this issue is necessary to do substantial justice. *State v. Minor*, 546 S.W.3d 59, 67 (Tenn. 2018); *Adkisson*, 899 S.W.2d at 641-42. Accordingly, he is not entitled to plain error relief on this issue.

### C. Rebuttal testimony of Detective Duncan

Defendant argues that the trial court erred by permitting Detective Duncan to testify in rebuttal that he attempted to speak to Defendant as part of his investigation. Defendant asserts that the rebuttal testimony infringed upon his right to remain silent and that it was improper because it pertained to a polygraph test. Defendant contends that Detective Duncan never attempted to get a statement from him but instead asked Defendant to take a polygraph test. He argues that the trial court's ruling infringed upon his right to impeach Detective Duncan because "[t]he only way to rebut the testimony would be to tell the jury about the polygraph[.]" The State responds that the trial court properly admitted the evidence after it found Defendant opened the door to the rebuttal testimony when his investigator, Mr. Andrews, made it "very clear . . . that it was vital to attempt to reach out to [D]efendant."

The Fifth Amendment to the United States Constitution provides in pertinent part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused shall not be compelled to give evidence

against himself." Tenn. Const. art. I, § 9. Additionally, while an accused may waive this right against self-incrimination, *Miranda v. Arizona*, 384 U.S. 436 (1966), as a general matter, a defendant may not be punished at trial for exercising his constitutional right to remain silent after arrest. *See Doyle v. Ohio*, 426 U.S. 610, 618 (1976); *Braden v. State*, 534 S.W.2d 657, 660 (Tenn. 1976). And because polygraph tests are inherently unreliable, "testimony concerning a defendant's willingness or refusal to submit to a polygraph test[] is not admissible." *State v. McCaleb*, 582 S.W.3d 179, 189 (Tenn. 2019) (quoting *State v. Damron*, 151 S.W.3d 510, 515-16 (Tenn. 2004)).

Defendant's argument that Detective Duncan's rebuttal testimony infringed upon his right to remain silent is without merit for several reasons. First, Detective Duncan offered no testimony about Defendant's silence. His limited rebuttal testimony was that, after the hearing on the order of protection, he approached Defendant and asked to speak to him about the case. Moreover, even if Detective Duncan had testified that Defendant was silent or that Defendant somehow refused to cooperate, the record establishes that Defendant was not in custody or under arrest when Detective Duncan approached him.[2] *See State v. Joshua Brandon Tate*, No. M2011-02128-CCA-R3-CD, 2013 WL 3964122, at *11-12 (Tenn. Crim. App. July 31, 2013) (concluding that the admission of testimony from a detective about the defendant's failure to show up for interviews on two separate occasions did not violate federal and state constitutional protections of the right to remain silent because the defendant was not in custody at the time that he failed to meet with the detective); *State v. Emoe Zakiaya Mosi Bakari*, No. M2010-01819-CCA-R3-CD, 2012 WL 538950, at *10 (Tenn. Crim. App. Feb. 15, 2012) (concluding that testimony from a detective was not a comment on the defendant's right to remain silent where defendant voluntarily met with the detective for two interviews and was not under arrest when he spoke with the detective); *see also Jenkins v. Anderson*, 447 U.S. 231, 235-36 (1980). Therefore, Detective Duncan's testimony was not an improper comment on Defendant's constitutional right to remain silent.

Additionally, we note that the trial court provided a rationale for the admission of Detective Duncan's testimony other than "to insinuate to the jury that [Defendant] was trying to avoid him and was not cooperating with his investigation." *Emoe Zakiaya Mosi Bakari*, 2012 WL 538950, at *10; *see also Brandon Tate*, 2013 WL 3964122, at *12. The trial court found that Defendant had opened the door to the testimony when his investigator testified that it was vital to contact the accused in a child sex abuse investigation and that he "[couldn't] imagine not" contacting the accused and that Detective Duncan's testimony was relevant to refute the implication that the detective did not contact Defendant.

---

[2] The record reflects that Detective Duncan approached Defendant on December 13, 2017, and that Defendant was not arrested for the offenses until January 11, 2018.

- 26 -

The Tennessee Supreme Court has reiterated the circumstances in which a party may render otherwise inadmissible evidence admissible through its own conduct:

> On occasion, a party wants to have its evidence cake and eat it too. This party may "open the door" to the admission of otherwise inadmissible evidence, then object when that evidence is rendered. Tennessee law has long recognized that a party "will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequences of his own neglect or misconduct."

*State v. Vance*, 596 S.W.3d 229, 250 (Tenn. 2020) (quoting Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence § 1.03[3][d] (6th ed. 2011)). However, one party's opening the door does not give the other party unfettered license to overcompensate for the error. *See id.* at 251 ("The otherwise inadmissible evidence sought to be introduced by the opposing party should be limited to that necessary to correct a misleading advantage created by the evidence that opened the door.").

Here, the trial court did not abuse its discretion by allowing the rebuttal testimony. *See Lewis*, 235 S.W.3d at 141. We agree with the trial court that the defense investigator's attack on the competence of the investigation and his repeated emphasis on the importance of contacting the accused for a statement opened the door for the State to present evidence about the extent of Detective Duncan's effort to talk to Defendant. Moreover, in accordance with the trial court's earlier ruling, Detective Duncan did not mention anything about the request for a polygraph or Defendant's willingness or refusal to submit to a polygraph test. *See Vance*, 596 S.W.3d at 251. Defendant is not entitled to relief on this claim.

### D. Questioning Defendant's father about Defendant's text messages

Defendant argues that the trial court erred when it sustained the State's objection and prevented defense counsel from asking Defendant's father questions about the text messages sent from Defendant to Ms. Cunningham. Defendant asserts that his father's testimony would have provided "important context" to the text messages and that the trial court's ruling violated his right to present a defense. The State responds that the trial court's limitation on the questioning of Defendant's father did not violate Defendant's right to present a defense.

"Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence." *State v. Flood*, 219 S.W.3d 307, 315-16 (Tenn. 2007). "Principles of due process require that a defendant in a criminal trial ha[s] the right to present a defense and

to offer testimony." *Id.* at 316 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)).  In *Washington v. Texas*, the United States Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law.

388 U.S. 14, 19 (1967).

The right to present witnesses, while of critical importance, is not absolute.  *Brown*, 29 S.W.3d at 432 (quoting *Chambers*, 410 U.S at 295).  "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302.  Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process.  *Id.*  "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).  To determine if an evidentiary ruling violates a defendant's right to present a defense, an appellate court must employ an analysis considering whether: "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301); *accord State v. Rimmer*, 623 S.W.3d 235, 279 (Tenn. 2021).

During direct examination of Defendant's father, defense counsel handed Defendant's father a copy of the text messages between Defendant and Ms. Cunningham introduced by the State as Exhibit 1 during Ms. Cunningham's testimony.  Defense counsel then stated, "The question I've got for you is about you being up and down.  If there is a text from [Defendant] that says[,]" at which point the State raised an objection based on lack of personal knowledge.  Defense counsel responded, "The question is, is if [Defendant] said he'd been up and down and can't decide whether he's hot or cold -- is that true that that night he had been up and down and didn't know whether it was hot or cold[.]"  The trial court sustained the State's objection, although it appears to have erroneously believed that the text messages were also hearsay, despite the fact that they had already been introduced by the State as substantive evidence.  *See* Tenn. R. Evid. 801(c).

- 28 -

Regardless of any error by the trial court in sustaining the State's objection under the Tennessee Rules of Evidence, we cannot conclude that the testimony defense counsel sought to elicit from Defendant's father through use of the text messages, *i.e.*, that Defendant's father had been up and down on the night of the offense, was "critical to the defense." *Brown*, 29 S.W.3d at 434. Defendant's father had already testified during direct examination that he had been up and down on the night of the offense, and on cross-examination, Defendant's father stated that he had been "up a lot" that night. Because the excluded testimony is cumulative to other testimony from Defendant's father already in the record, Defendant has not shown that he was denied his constitutional right to present a defense. He is not entitled to relief.

### E. Improper prosecutorial argument

Defendant next contends that the prosecutor engaged in improper prosecutorial argument when he told jurors to "put themselves in the shoes of a [twelve]-year-old girl being violently raped by her stepfather" during rebuttal closing argument. Defendant acknowledges that he failed to raise a contemporaneous objection to this "improper, inflammatory argument" but contends that he is entitled to plain error relief. The State responds that the prosecutor's argument does not rise to the level of plain error.

A trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *Banks*, 271 S.W.3d at 131.

In *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003), this court listed five general areas of improper prosecutorial argument during closing: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim.

App. 1996). In *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper argument of a prosecutor affected the verdict to the prejudice of the defendant:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

*Id.*

Defendant failed to raise a contemporaneous objection to the alleged improper argument. The Tennessee Supreme Court has previously stated that "[i]t is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument[,]" explaining that a timely objection gives the trial court the opportunity to assess the State's argument and to take appropriate curative action. *Jordan*, 325 S.W.3d at 57-58. A defendant's failure to object contemporaneously will constitute a waiver of the issue on appeal. *Id.* at 58 (citing Tenn. R. App. P. 36(a)). Even when a defendant raises the issue in a motion for new trial, the lack of a contemporaneous objection requires that the improper argument be "exceptionally flagrant" and constitute plain error before a defendant is entitled to relief. *State v. Richard Gleason*, No. W2018-01389-CCA-R3-CD, 2020 WL 633111, at *8 (Tenn. Crim. App. Feb. 10, 2020) (citing *Banks*, 271 S.W.3d at 132), *perm. app. denied* (Tenn. Aug. 10, 2020).

During closing argument, defense counsel challenged E.R.T.'s credibility by asserting that the circumstances of the encounter made her testimony implausible and that inconsistencies in her testimony showed that she was dishonest. Defense counsel argued:

> Was it reasonable to believe that [Defendant] came in and stepped over a child that was one foot and ten inches away from the [hospital] bed? That a violent act occurred and nobody woke up? Now, stretch your imagination just a little bit, okay? If this act happened and he prevented her from screaming and he did this act and didn't wake up this child, okay, and he got up and he left, and the door was locked, and a man who's just raped

you is trying to get back in, you don't wake up your sister right there? If he was trying to get back in a second time to do it again, you wouldn't . . . wake her up? Sorry. You wouldn't scream for your Papa who was nine feet away?

During rebuttal, the prosecutor responded to the defense argument, stating:

Makes it sound like it's unreasonable that [E.R.T.] laid there and didn't say anything, that she didn't scream. You know, we quite often want – somehow or another sometimes people want to blame a victim for not fighting. You want to blame a victim for not screaming. You think, well, I would have done something. Well, let's imagine what the [twelve]-year old you would have done, not what the adult brave and bold person would do, the [twelve]-year old. Because here's a girl that was in a house with her stepdad's family, and this unimaginable act has just occurred. Her story's changed, it has. She did at one time make it sound like she, you know, put up a struggle or she started to scream, she fought back. And then she told you here today how disappointed in herself she was that she just froze. I'm not gonna stand here and tell you that I can imagine what that was like, because I don't think I can imagine. All I can do is listen to her and decide whether I believe her, and that's what you have to do, listen to her and decide whether you believe her.

It is clear in this context that the prosecutor was not asking the jury to imagine being raped by a parent but was, instead, defending E.R.T.'s credibility by asking the jury to evaluate her testimony in light of her young age and situation and not based on what an adult rape victim might have done. Defendant has not shown that a clear and unequivocal rule of law was breached; that a substantial right of Defendant's was adversely affected; or that he did not waive the issue for tactical reasons. *Adkisson*, 899 S.W.2d at 640-41. He is not entitled to plain error relief.

### F. Use of facility dog during trial

Defendant argues that he is entitled to plain error relief based on his claim that the trial court improperly allowed a facility dog to be used during the testimony of D.C. and E.R.T. He contends that the facility dog was "paraded" into court in front of the jury multiple times without the trial court "discussing the necessity of the animal, the qualifications of the animal, or ensuring that the presence of the animal would not be seen by the jury." Defendant claims that the record contains no proof that he made an agreement with the State to allow the use of the facility dog during the witnesses' testimony and that, even if there had been an agreement, the trial court had a duty to determine if the animal met the basic requirements laid out in *State v. Reyes*, 505 S.W.3d 890 (Tenn. Crim. App.

2016). The State responds that the use of the facility dog during the testimony of D.C. and E.R.T. was not plain error.

From the record on appeal, it does not appear that either party filed a pretrial motion regarding the use of a facility dog during trial. Prior to D.C.'s testimony, the prosecutor informed the trial court that there was "an agreement" on the use of a facility dog. Although defense counsel did not confirm on the record the existence of an agreement, defense counsel did not raise an objection or otherwise dispute the prosecutor's statement. Moreover, during the hearing on Defendant's motion for new trial, the State explained:

> [W]e spoke to [d]efense counsel prior to the trial, and General Barclay asked [d]efense counsel if it was going to be necessary to file a motion to have a *Reyes* hearing and they agreed to the usage of the facility dog. So, there was a prior agreement with [d]efense counsel that a motion would not be necessary, and then there was no objection during the actual trial.

Then, in denying the motion for new trial, the trial court found that "[t]he parties agreed, as I understand, that this dog could be brought in."

Even if there was no agreement for the use of the facility dog, Defendant clearly did not object to the use of the dog. By failing to raise a contemporaneous objection, he has waived our consideration of the issue. *See* Tenn. R. App. P. 36(a); *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010). Moreover, Defendant has not established that relief should be granted under a plain error analysis.

Tennessee Rule of Evidence 611 provides that "[t]he court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Tenn. R. Evid. 611(a); *see also State v. Cazes*, 875 S.W.2d 253, 260 (Tenn. 1994). The 2017 Advisory Commission Comments to Rule 611 states, "Nothing in these rules prohibits the court in its inherent authority from permitting a suitable animal, toy, or support person to accompany a witness who is shown to be at risk for being unable to communicate effectively without the aid of such comfort."

In *Reyes*, the trial court permitted the minor victim of a sexual offense to testify at trial with use of a facility dog after a pretrial hearing on the defendant's motion in limine concerning the dog's presence in the courtroom during the minor victim's testimony. *Reyes*, 505 S.W.3d at 895. At the hearing, the State presented testimony concerning the facility dog's qualifications and its effect on the victim. *Id.* at 895-96. The State explained that the dog would not be taken in or out of the courtroom in the jury's presence. *Id.* at 896. The State also indicated that the dog would be positioned in the witness stand in such a manner that it would be partially hidden from the jury's view. *Id.* Furthermore, the trial

court instructed the jury to make no inferences concerning the dog's presence nor to allow sympathy to arise from the dog's presence. *Id.* at 898.

Although the trial court in this case did not conduct a hearing and make explicit findings concerning the facility dog's qualifications and the necessity of the dog's use during trial, this court has previously held that a hearing and such findings are not mandated by *Reyes* or by Rule 611 of the Tennessee Rules of Evidence. *State v. Christopher Nicol Cox*, No. E2020-01388-CCA-R3-CD, 2022 WL 325596, at *11 (Tenn. Crim. App. Feb. 3, 2022). Additionally, the record does not indicate that the dog was "paraded" around the courtroom, as asserted by Defendant in his brief; nothing in the transcript describes how the dog entered or exited the courtroom or to the extent it was visible to the jury. The trial court also gave the jury an appropriate limiting instruction to ensure that the use of the dog did not affect the jury's deliberations, and jurors are presumed to follow the instructions of the trial court. *State v. Reid*, 164 S.W.3d 286, 342 (Tenn. 2005). Without more, Defendant cannot show that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, or that he did not waive the issue for tactical reasons. *See Smith*, 24 S.W.3d at 282 (listing the plain error factors). Defendant is not entitled to plain error relief on this claim.

### G. Use of the term "victim"

Defendant contends that he is entitled to plain error relief because the prosecutors and Detective Duncan repeatedly referred to E.R.T. as "victim" when her "status as victim was an issue for the jury to decide." The State responds that Defendant waived this issue and that the minimal use of the word "victim" before the jury did not constitute plain error.

We agree with the State that, by failing to object, Defendant waived our consideration of this issue. Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); *State v. Frank Graham*, 2013 WL 2395321, at *17 (Tenn. Crim. App. May 31, 2013) ("[A] party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error.").

Moreover, Defendant is not entitled to plain error relief. A review of the record shows only two pages of transcript on which the prosecutors used the term "victim." At one point during E.R.T.'s direct examination, the prosecutor asked her to draw the spare bedroom where the rape occurred. As E.R.T. complied with the prosecutor's request, the prosecutor addressed the court: "And your Honor, due to the softness of the victim's voice, I'm gonna let her draw and then I'm gonna have her turn back around to speak." Then, during rebuttal argument, the prosecutor said "mother of the victim" once and made

reference to "a victim" twice. Defendant also identifies in his brief a single page of transcript on which Detective Duncan used the term "the victim," stating that when he arrived at the hospital, he "was advised where the victim was and proceeded to go speak with the victim and her mother." In the context of the entire trial, the references to E.R.T. as "the victim" were minimal, and we note that, in its charge to the jury, the trial court instructed that "[v]ictim means the person alleged to have been subjected to criminal sexual conduct." Under these circumstances, Defendant has not shown that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, or that he did not waive the issue for tactical reasons. *See Smith*, 24 S.W.3d at 282.

## H. Cumulative error

Finally, Defendant contends that he is entitled to relief under the cumulative error doctrine. The State responds that Defendant has not shown multiple errors occurred during the trial.

"The cumulative error doctrine exists to protect a criminal defendant's state and federal constitutional right to a fair trial." *State v. Herron*, 461 S.W.3d 890, 909 (Tenn. 2015). The doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. In this case, having not found any error committed by the trial court, there can be no relief under the theory of cumulative error. *State v. Colvett*, 481 S.W.3d 172, 209 (Tenn. Crim. App. 2014).

## III. Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 34 -